Our next case, social security matter, Keller v. Berryhill. Mr. Duncan. May it please the court, Dana Duncan appearing on behalf of Susan Keller. Susan Keller was, at the time of her alleged onset of disability, a 30-year-old woman. She had, that onset date was listed as June 30th of 2001. She had reported back problems through the years that resulted in surgery, worsening of the condition in 2012, which necessitated an application for SSI or Title 16 disability coverage. Your Honors, having just sat through the previous oral arguments, this is not a multi-million dollar case. This is an SSI case. Claimant would be entitled to receive about $800 a month. And what we're, what I'm here today to, is. You've had social security cases that turn out to be multi-million dollars for other folks, so it adds some implications for other cases. It does. And what my point of this is, is that there, the issues in this case permeate through this circuit. There were three issues that I alleged. First was, is that the, there's a failing to complete a function-by-function assessment of Keller's non-exertional mental impairments. There was a failure to comply with the relevant law in identifying and resolving conflicts. And that there was a problem as far as the credibility and the pain assessment that's required under the regulations. At the start, I point out to the heart of the function-by-function analysis is the method that ALJs are directed to use. It's called a sequential process, which I'm sure the Court's aware of. At step three, you're supposed to take mental impairments, in this case her back problems and her mental impairments, and evaluate whether she meets or equals a listing. Once you reach that point, if they do not meet the listing, which would preclude all competitive work, not just work available in the national economy, those medical conditions are to be translated into a hypothetical question. And that hypothetical question under SSR 96-9 or 8P is supposed to be done in a step-by-step approach so that you can see exactly the thought process that the ALJ employed going from the condition to what's in the hypothetical question. In order to do that function-by-function, my argument is that the ALJ has to first explain how he determined the impairment existed, second, how the impairment addressed the claimant's condition, and what evidence supported the first two findings. We have mental limitations of simple routine repetitive, production rate or no demanding pace, attention and concentration for two-hour segments. There's nothing in the decision that indicates how exactly her mental impairments result in those limitations. The judge's decision goes at great lengths to say what she could do, which shows that her condition is not disabling, but it doesn't explain how those limitations apply. The substantial evidence test that applies in Social Security is supposed to be given deference in two circumstances. One is, does the judge actually explain his positions and is the conclusion he reached logical? That's why the thing is, you look at the evidence and would a reasonable mind concur with us? Not the result, but concur that point A to point B is a logical connection. In this particular case there is no such logical connection because we have no idea. You cannot pick up the decision, read it, and come to any clear conclusion as to how the judge arrived at those limitations for her mental impairments. Substantial evidence, the T-Mobile limited versus City of Rockwell Supreme Court case. Should I just clarify for a moment? I'm trying to follow your brief and your statement of issues. What is your argument going to be? I'm doing the second argument first. It's the function-by-function assessment. Thank you. Sure. Substantial evidence requires that grounds upon which the administrative agency acted be clearly disclosed and that courts cannot exercise their duty of substantial evidence review unless they are advised of the considerations under the action under review. Really what it's applying is that the decision in Patterson laid out that you're supposed to explain how you came up with this stuff. You should be able to show your work. You don't like the hypothetical question that the ALJ asked. Well, let me just put it this way, Judge. If you go to the absurd lengths, all right, if the judge doesn't tie it to anything, he could put anything down. I limit the claimant to not working around people who wear red. I don't want her to be exposed to any individuals who hum or sing to themselves. Unless you have something that shows what the condition is or how it arrives, it's meaningless. And you can go through, and I did this in a presentation two weeks ago in San Francisco to the National Social Security Lawyer Organization. I presented about 75 cases where the hypothetical question is identical for everything from cognitive disorders to post-traumatic stress disorders to bipolar disorder to schizophrenia. It's become a generic catch-all that judges know that if they ask it and phrase it in a certain way, they're going to elicit an answer from the vocational expert that there are jobs available. Okay? That's not the way this is supposed to work. You're supposed to be able to identify. Now... So you're saying the questions they ask the vocational experts are kind of a setup? Yes. I'll be that blunt and say yes. It allows arbitrary and capricious actions on the part of ALJs. And that's error for them to phrase it, do they? Yes. Now, Social Security did... Now, you're saying it's reversible error here, this hypothetical question, right? Correct. Because... Is it harmless error? It shouldn't be harmless error because... Does the harmless error doctrine... Yes. ...apply? I mean, we get that a lot here in criminal cases. They're always... The governments up here are going to harmless error a lot. Okay. It shouldn't. If the district is a trial court, it's all right. You have to look at the whole case and see whether it really made a difference. Wouldn't the same kind of analysis apply in a civil claim like this? No. And this is why. If you ask a hypothetical question to almost... An erroneous hypothetical question, it's automatic reversal. Yes. Because the issue ultimately is at Step 5. And the burden of proof at Step 5 rests with the commissioner. So if they haven't been able to articulate sufficiently the grounds or their own hypothetical question, then why should this court uphold their poorly crafted decision? ...did this hypothetical... I'm having a little trouble following your argument. Although I would first like to thank you for referencing Patterson and showing the work. Apparently that's very popular. Yes. But here, the ALJ found that Keller had the residual functional capacity to perform light work under certain circumstances and described the limitations. And also spent a lot of time at that point discussing the importance of pain following the two-step process that we say they have to follow. And in fact documented the pain. Said that her medically determinable impairments could reasonably be expected to cause the alleged symptoms. Yes. What specifically are you saying was the deficiency? Okay. Under the current regulations, under 20 CFR section 404 subpart P appendix 1. When the judge found moderate limitations of concentration, persistence, and pace. Okay. And the regulations clearly outline at 20 CFR 416.945 that even non-severe impairments have to be evaluated and considered. When he made that finding, he should have considered things like initiating and performing tasks and understanding what you know, working at an appropriate pace and consistent pace, completing tasks in a timely manner, ignoring or avoiding distractions, changing activities or work settings, working close to or with others without interrupting them, sustaining an ordinary working. Yes. To the extent that the judge found that there was a moderate impairment of concentration, persistence, and pace and a moderate impairment for activities of daily living. So to that extent, these factors should have been further evaluated, not using the generic simple routine or repetitive, which has nothing to do with concentration, persistence, or pace. The difference. I mean, you say the judge here, earlier you were talking about the administrative law judge. Yes. Not the district judge. No, this court reviews this case de novo. I understand all that, but I want to make sure you talk about it. Nope, that's fine. The judges. We had a district judge that you appealed from. Correct. You had an ALJ judge in the administrative proceeding. Yes. And you just said the judge. Yes. I apologize. I just want to make clear when I'm referring to the judge in this particular context, it's an ALJ. The reason that I'm having a bit of difficulty following this is, the ALJ here did something that I found particularly even-handed. For example, the ALJ gave less weight to some medical opinions, that of Dr. Clayton, for example, because he felt that Dr. Clayton didn't adequately consider Keller's needs. So in other words, the ALJ discounted medical testimony that he felt gave too short a shrift to Ms. Keller's limitations. And he took into consideration what the treatment records showed that she had not complied with medical instructions. And it's quite true that she did not undergo physical therapy, but recognized, did not penalize her for that because she said she was financially unable to do so. Yes. But then went on to point out that she was told to wear her bertal line brace at all times, and was instructed more than once. I'm trying to look for the failures of the ALJ. But Judge, the point is that ALJs are directed when they're evaluating credibility. Okay, the commissioner issues these rulings that instruct the ALJs on how to interpret their own regulations. And in there, it says the ALJ shall make any inquiry about anything that's going to result in an adverse credibility finding. What I don't understand is how he did not. Because first of all, he documented the pain. He did document the pain, and found that her medically determinable impairments could be reasonably expected to cause the ALJ symptoms. But he went on to conclude that the statements concerning the intensity, the duration, and the limiting effect of the symptoms were not entirely credible, and then went on to explain that in some length in reference to the medical record. But the problem is, is that, and there's twofold here. One is, is if we're talking about pain, let me just ask, or throw this particular point out, which was going to be part of my further evaluation here. The difference is, is the claimant at the time that she was ultimately had her hearing was close to 50. And, but either way, if she's, the judge found her sedentary, which is the easiest form of exertional impairment. She said she could not work full time. If she couldn't work full time, she would be disabled under law. So the question there is, if we're talking pain, where in here does it say the judge found that she needed a walker to ambulate? I mean, that's a pretty, that shows a pretty severe level of pain. She can't walk without a walker. Yet, he makes no reference to say anything indicating why it's about. I guess, for example, he relied in part on her inconsistent statements that following the post-operative visit, she reported that she was doing better and her leg was feeling much better. He relied on both the medical, or appears to have relied on both the medical record and internal inconsistencies in her testimony. Okay. The problem again is, is where, is we're losing sight. All right. And let me put it very succinctly. The substantial evidence test is not an issue of volume. Putting enough findings into the decision is not the same as providing analysis and logical conclusions. If that were, if volume alone was sufficient, an ALJ would simply have to write, here are my findings, and I attach the transcript in full as support. We have a situation where he never explained how he considered her pain in assessing her area of exertional limitations. We have a problem with the fact that he never explained how he arrived at those mental conditions and that those limitations applied to her mental condition. If someone were to pick up a decision and have to question why or how the ALJ came up with a particular finding, then that is not substantial evidence. And there are gaps in this decision of significance without providing a proper explanation. And that's the point in all these. I did want to point out, and I'm eating into my rebuttal time, but I did also want to point out the problems outlined with regard to the conflict in the testimony of the vocational expert and indicate that that also is a significant factor because taken on its face, in the Kenderson case, which was unpublished, addressed this. There's a marked distinction between simple routine and repetitive and the definition of reasoning under reasoning level three in the Dictionary of Occupational Titles. But I'll reserve the remainder for rebuttal. Thank you, sir. Mr. Deadweller? Good morning, Your Honors. May it please the Court, my name is Gabriel Deadweller, and I represent the Acting Commissioner of Social Security. Let me first address the issue of the ALJ's RFC assessment, the residual functional capacity assessment, and the allegation that it was not a function-by-function assessment. Some of this language comes from Social Security Ruling 96-8P, which requires ALJs to do a function-by-function assessment, and that is exactly what the ALJ did here. That ruling talks about work-related mental activities include ability to carry out remembered instructions, use judgment in making work-related decisions, deal with changes. The RFC here goes through all of these. It talks about she can follow short and simple instructions. She can sustain attention and concentration for up to two hours at a time, and so on. So it's exactly the function-by-function RFC that is required by the ruling. In fact, compared to this Court's decision in Mossio, where in that case, the RFC limitation was simply unskilled work, and that is not what we have in this case. Now, to go more directly to this idea of accounting for moderate limitations in concentration, persistence, and pace, and the allegation that there is a lack of support for this RFC, in the decision, on page 55 in the transcript, the ALJ actually talks about the evidence that she relied on in finding most of this RFC. This claimant did not have extensive mental health treatment. She was prescribed Xanax. She took antidepressants for a short time following her death in the family. And the primary evidence in this case related to mental functioning is a consultative exam with Dr. Medford. And Dr. Medford opined that Ms. Keller could understand, retain, and follow instructions, could sustain attention to perform simple repetitive tasks, and the ALJ specifically gave that aspect of the opinion weight in assessing the RFC. So that fully explains the finding that she could follow short, simple instructions, perform routine tasks. It fully explains the finding that she could sustain attention and concentration for up to two hours at a time. The other thing to look at is why did the ALJ find moderate difficulties in concentration, persistence, and pace? And this is on page 50 of the transcript. And basically what the ALJ said is that I'm finding moderate in order to account for potential. And I emphasize the word potential effects of mental impairments. In other words, this ALJ was maybe going beyond what is directly in the record, was giving the claimant some benefit of the doubt. And these limitations in production rate, demanding pace, ability to sustain attention and concentration, restricting her from crisis situations, complex decision making, these are exactly the kind of limitations that would coincide with her anxiety and with her own testimony that she gets frustrated because she can't do what she used to do, that she sometimes has panic attacks. And again, even in looking in the physical RFC, there's an explanation for where that came from on page 54 of the transcript. The ALJ specifically cites a state agency opinion, finding light work, and then says, in a light, more fable to the claimant, and looks at the combination of impairments as explaining why she's coming up with the RFC. And now... I actually did consider the fact that she could walk with the assistance of a walker in the RFC analysis. Correct, Your Honor. The judge didn't say a walker, per se. He said an assistive device, and specifically linked it to her hypotension and obesity. And in general, the consultative exam in 2012, that doctor said that assistive device is not medically necessary. So a reasonable ALJ could have gone, could have constructed a different RFC. I think it's evident from this decision that this ALJ is being fair and looking at potential effects of mental impairments and the combination of impairments, and making sure that they're all accounted for in the RFC. As far as the evaluation of symptoms, the main point I'd like to make here is that this decision needs to be read as a whole. And if the court, just like the district court, considers the entire narrative discussion, as Judge Duncan's questioning showed, it shows consideration of the longitudinal record, her treatment history. And the fact is that she had surgery. She had a back issue. She had surgery in July 2008, and again in September 2009. And that corrected the issues by her own reports. Then there's a large gap in treatment. And then she had issues, a different issue, not necessarily with her lower back, but with her, what was diagnosed as piriformis syndrome, which is a muscle behind the gluteus maximus that can impact on the sciatic nerve. And she had another round of treatment between January 2012 and July 2012 that addressed that issue with two surgeries. And the ALJ's discussion ends with consultative exams in 2012, even though the hearing and decision are in 2015. But that's not because the ALJ was not looking at the record. It's basically because there's nothing else there. In plaintiff's briefs, there is one example, can come up with one example of one treatment visit after 2012 related to back pain. And that's an emergency room visit where she reported intermittent back pain and was given some anti-inflammatory medication. But that hardly suggests a course of treatment, a long-time course of treatment, that would support her allegations of disabling hip, back, and leg pain. Finally, the ALJ did consider her reports of why she wasn't pursuing treatment before making inferences related to her credibility because of her non-compliance with treatment. The final point I wanted to address is the issue of whether there was a conflict between the vocational expert's testimony and the dictionary occupational title. And this court in Pearson expressly rejected a contention that an ALJ must resolve all conflicts and stated that the court was drawing a line there because the court was not going to require ALJs to do more than simply compare the express language of the DOT with the V's testimony. And if the court looks at the express language of the reasoning levels at issue, and specifically reasoning level three, there is nothing in the express language that conflicts with this RFC. Reasoning level three requires the individual to apply common sense understanding to carry out instructions furnished in written, oral, or diagrammatic form. And there's nothing in there that says that these instructions are inherently long or inherently complex. And in fact, all those reasoning levels, R1, R2, R3, talk about applying common sense understanding to carry out instructions. And there's some gradation in the complexity, but there's no indication that in the express language that it's at conflict with the RFC in this case. Now, Henderson is distinguishable because that RFC is entirely different than what's at issue in this case. In Henderson, the RFC was specifically one to two step instructions. And that is in the express language of reasoning level one. And the court could reasonably see a conflict there based on the express language. So to the extent a line should be drawn, it's not between R3 and R2, or the line is really between R4 and everything lower. Because R1, R2, R3 are all consistent with the regulations which define unskilled work, and this is at 416.968, as work which needs little or no judgment to do simple duties that can be learned in the job in a short period of time. And all of these jobs that the vocational experts cited at the ALJ relied on, whatever the reasoning level R1 through R3 fit within that definition. The final point I would like to make is about harmless error. I had a note to ask you about that, harmless error. Yes, Your Honor. I'll give you a shot at that. And I don't see an error in this case. So I don't think harmless error is an appropriate measure in this case. But what is going on in this case, it does apply to Social Security cases. The Supreme Court indicated that in the Shinseki decision, where it said if a claimant, if the allegation is of error, the claimant must show some prejudice, and cited Social Security cases in the string site following that statement. And my point is that plaintiff has never alleged that she cannot perform the work in this RFC. So even if there were an error somewhere in the RFC, if you look at the substantial evidence review and all the evidence that the ALJ considered, where is the evidence that she cannot perform in the work? And the same goes with the argument about whether there's an apparent conflict between with the RFC and the job cited by the VE. There is no argument that this particular claimant can't do those jobs. In fact, she has a history of semi-skilled work, which is as a home health aide. The vocational expert testified, this is on page 77 of the transcript, that this was semi-skilled work. So this is already beyond what's in the RFC, and she showed the ability to do that work. Similarly, I mean, one of the jobs that the VE cited is a food and beverage clerk, which is someone who works at like a fast food window where you take orders, food and beverage orders, and you take money from the customer. And so there is some, you know, you need to follow instructions. These instructions might be in a diagram, how to use the soda machine. There's some variation. You have to distinguish Diet Coke from Coke, things like that. But that is not anything that goes beyond the RFC. And in fact, this claimant, in her work history, it was not past relevant work because it was not recent enough to be considered past relevant work, but she used to work at McDonald's and KFC. So the larger point being, you know, Mr. Duncan is making arguments based on legal errors and legal rules, but that also has to be combined with what the evidence in this record, this particular claimant, what the ALJ was looking at, and some allegation that the claimant was prejudiced. And so there may be a case where an ALJ maybe should give a better explanation of why there's a production rate limitation, what exactly this means. But that's not this case, because that is not really at issue, as the court said in Mascio in talking about function by function. They weren't going to, there's no per se rule. You have to talk about every function in every case. It's really what's contested, what's at issue. And as I mentioned before, it seems very obvious that the ALJ was giving this particular claimant the benefit of the doubt. And same with applying Pearson and looking whether there's apparent conflicts. There's at least some burden, there should be at least some burden to say, well, I actually cannot perform, you know, this claimant cannot perform these jobs. And many of the circuits that have looked at this have not adopted a per se rule precisely because of that, because they go on to look at harmless error, they go on to look at the record as a whole. So if there's no further questions, Your Honor, that's the end of my prepared remarks. Thank you very much, sir. Thank you. Appreciate it. Mr. Duncan? All right, thank you. To start, I would just point out as far as the medical vocational issues or the conflict with reasoning, the commissioner publishes a book or booklet on a semiannual basis called the vocational handbook that's given to all vocational experts. In that book, it's available if you just Google it. It specifically indicates be prepared to answer if there is a conflict, if asked, if you list a job that is a reasoning level of three. So the commissioner, by her own publication, has conceded that there's a potential conflict between jobs that are reasoning level three and jobs that are reasoning level one and two that the judge should probably be inquiring about. As far as the rest, the commissioner makes a big point about... I think the commissioner shouldn't do that anymore. Well, you can't have it both ways. You can't put it in your publications that a potential conflict exists, then come to court and argue that it doesn't. I understand that the bureaucracy of an SSA is overwhelming and they can't be aware of every potential thing that's in their publications, but they set guidelines. Because they're trying to help everybody out and try to be consistent. They're trying. And so the point being is when they're trying... They're all trying. Yes. All of us trying to investigate. Correct. Anyway, the point being, though, is that this is a conflict that they've identified, a potential conflict that has arisen that they have indicated should be resolved. As far as... I guess the point continues to be, and I'll address the harmless issue. First, it was never raised by the commissioner. But second, the reasoning... I ask if the doctrine applies in social security cases. It does apply. You say abstract. Correct. It does apply in social security cases. You say it doesn't apply. It does apply. Does apply. But not in this particular case. No, if I said anything else, then that was my mistake. Automatic reversal, I ask you that. If there was an error, you said, yes, there was. All right. That's telling me that it didn't apply. But now you agree with the government. Correct. What I meant to say is when you're talking about specific elements, you can't... It is unlikely that harmless error will ever be triggered. Because when you're talking about a hypothetical question, for example... We could say, in the right case, that assuming there was an error... Yes. Assuming that the balance is right, the error is harmless. You may do that. But in this particular case, it does not apply. And your point is it doesn't apply here. Yes. As an example, I can point out that if I ask a vocational expert if a person is off work three days a month, they're going to tell you every time that there are no jobs. If a person is off two days a month, you might get them to say there are. And one job, there's going to be... That's acceptable in employment. So that minor little discrepancy in a hypothetical question can make or break a case. And so that's the point that I'm making is trying to read a hypothetical question to derive that it's harmless is very difficult. So you're trying to nitpick it. They're saying the hypothetical question. And is that right? That's what he's saying. You're trying to nitpick the hypothetical question. My point is, though, Judge... That's what lawyers ought to do. They ought to nitpick it. Yes. And what I'm going back to my original point is... Makes you do a better job. Yes. We have a situation right now where the case law has clearly indicated that the judges are supposed to explain how they arrived at their conclusions. And... The hypothetical question, in the hypothetical case, the ALJ specified that the claimant could not perform work that requires a production rate or demanding pace. So why doesn't that address Keller's moderate limitation in concentration, persistence, or pace? Why is that? How does it? That's... Okay. Sorry. I apologize. Why is that not a legally sufficient hypothetical question when it appears to parrot at least part of the specification and address it? Okay. The classic situation in this particular case is... Why is the term production rate paced? Because production usually means assembly and the vocational experts will talk about that. Are you going to answer sort of my question? Is that what we're going to get into? Yes. All right. And I guess what I'm getting at, and I guess maybe if I'm not understanding your question exactly... It just seemed to me that the hypothetical did mimic or parrot some of the specific limitations. And what I'm trying to understand is what was deficient in that? The fact is that it's limiting it to production rate pace. Production rate pace vocationally implies assembly line, where somebody else controls the pace. The problem is there's nothing that says that that's the only limitation. For example... And it isn't. I'm just saying it mirrors... As far as pace, that's the only... It doesn't describe how he arrives at just that. For example, does that then allow her to be a hotel cleaner where you have to do 15 rooms a day? Does it allow her to be a cashier at a fast food establishment where they have a lunch rush where you have to be moving very fast on a consistent basis? So I know that it may seem at times that I'm trying to nitpick, but if ultimately the question is that we have to try to search around to come up with the conclusions or figure out how the judge arrived at this conclusion, that should not be substantial evidence. We're simply, as claimants' representatives, simply asking that judges explain better how they arrive at this so that we have some hope of understanding where they're coming from and explain it to our clients. We understand your position. We appreciate it. All right. Thank you. Appreciate it very much. We'll come down and agree counsel and take a short break. This honorable court will take a brief recess.
judges: Robert B. King, Allyson K. Duncan, James A. Wynn Jr.